BARTOLA (SERAFINA) MUNDO ET AL., Plaintiffs and Appellants, *v.* PEDRO FUSTER ET AL., Defendants and Appellees.

No. 12889.  Decided February 15, 1963.

344

*Ricardo R. Rivera Correa* for appellants. *B. Sánchez Castaño*
and *R. Rivero Cervera* for appellees.

Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Rigau, and Mr. Justice Dávila.

MR. JUSTICE DÁVILA delivered the opinion of the Court.

To give an opportunity to defendant to be heard is an essential element of due process deeply rooted in the Constitution. *Jacob* v. *Roberts*, 223 U.S. 261 (1912). In order that such opportunity may be effective, it is necessary to serve personal notice that he has been sued. "Judgment without such citation and opportunity wants all the attributes of a judicial determination; it is judicial usurpation and oppression, and never can be upheld where justice is justly administered." *Galpin* v. *Page*, 85 U.S. 350 (1873). In certain instances in which it is impossible to summon him personally because his whereabouts is not known, the law authorizes the publication by edicts in a newspaper of general circulation.[1] *Mullane* v. *Central Hanover Tr. Co.*, 339 U. S. 306 (1950). Necessity has compelled acceptance of other forms of notice which have been sanctioned by the courts. *International Shoe Co.* v. *Washington*, 326 U.S. 310 (1945); DAMBACH, *Personal Jurisdiction: Some Current Problems and Modern Trends*, 5 U.C.L.A. L. Rev. 198 (1958); Comments: *Personal Jurisdictions over Absent Natural Persons*,

---

[1] Section 94 of the Code of Civil Procedure—32 L.P.R.A. § 458—which was in force at the time the summons in the case against plaintiffs herein, was issued, provided:

"Section 94.—When the person on whom the service is to be made resides out of the said Island, or has departed from said Island, or cannot *after due diligence*, be found within said Island, or conceals himself to avoid the service of summons, when he is without any known residence ... and the fact appears by affidavit to the *satisfaction of the court or a judge thereof*, and it also appears by such affidavit, or by the verified complaint on file that a cause of action exists against the defendant in respect to whom the service is to be made, or that he is a necessary or proper party to the action, such court or judge may make an order that the services be made by the publication of the summons." (Emphasis added.)

Rule 4(e) of the Rules of Civil Procedure of 1943 established a similar procedure; also Rule 4.5 of 1958.

44 Calif. L. Rev. 737 (1956); EHRENZWEIG & MILLS, *Personal Service Outside the State*, 41 Calif. L. Rev. 383 (1953). In the action which gave rise to this case summons was served by edicts, and it was alleged that defendants were persons unknown in the community where they lived. Let us consider the facts in detail.

When plaintiffs' predecessor died on March 26, 1931, he was survived by his widow and 24 children. He had contracted marriage twice. In his first marriage he begot 17 children of which five predeceased him. He became a widower and married the second time and begot 12 children. One of the children by the first marriage was a physician and had served as charity doctor in the Municipality of Loíza, and was elected mayor of that town in the 1932 elections. At the time of his death the decedent owed $628.75 to **Hernáiz Targa & Cía.** of San Juan. In order to collect the debt, that firm brought an action against "the unknown Heirs of the late Facundo Mundo." Simultaneously it obtained an order to secure the effectiveness of the judgment and attached real property which was recorded in the Registry in the name of said decedent. Plaintiff alleged that "it does not know whether or not Mundo executed a will and who were his legal heirs or successors, nor their place of residence, but plaintiff alleges that his heirs and successors have not paid in whole nor in part the sum of $628.75 due to it by the late Facundo Mundo." The complaint was filed on January 18, 1933, and on February 23 the summons was returned unserved.

Service by publication was authorized. Edicts were published in "La Democracia" on February 27, March 6, 13, 20 and 27, and April 8, 1933. Defendant did not appear. Default having been entered and a hearing having been held, judgment was rendered for plaintiff firm. Notice of the judgment was served by edicts. It was executed on the attached property of defendants' predecessor. The property—

four farms—were auctioned and adjudicated to the creditor firm. The deed of judicial sale having been executed, it was recorded in the Registry of Property on September 2, 1933.

Two of the farms, one of 75 cuerdas and another of 14 cuerdas, were sold on July 15, 1937, to Pedro Fúster for the price of $1,501.43.[2] The residence of Facundo Mundo's widow and her 12 children was established on the farm of 14 cuerdas. They filed an independent action against the liquidator of Hernáiz Targa & Cía. to recover the homestead. In order to satisfy the judgment entered, Fúster consolidated the two farms of 75 and 14 cuerdas and segregated 20 cuerdas which he transferred to the widow and her children by deed No. 8 of November 17, 1939. On January 16, 1947, Fúster sold the remaining 69 cuerdas to Aurelio Rodríguez for the price of $2,000.

The present action, seeking the nullity of the judgment rendered in the aforesaid action of debt as well as the revendication of two of the farms adjudicated to Hernáiz Targa & Cía. and which were sold to Pedro Fúster, who consolidated them and segregated one of 20 cuerdas and sold the remainder to Aurelio Rodríguez, was brought in October 1948. Claim is also made for the fruits received which allegedly amount to $24,000.[3] The complaint was directed against Pedro Fúster, the heirs of his deceased wife, against Aurelio Rodríguez, and against the liquidator of Hernáiz Targa & Cía. Plaintiffs desisted from their action against the latter. Defendants then filed a third-party claim against the partners of Hernáiz Targa & Cía. Only one of the partners was summoned and he raised the question that any action against him had prescribed. The trial court so determined. Defendants appealed to this Court seeking review of said ruling, but their petition was dismissed. *Mundo* v. *La Mer-*

---

[2] Another farm was acquired by one of the heirs of Facundo Mundo.

[3] This claim was subsequently abandoned.

*cantil Pedro Rodríguez Anté & Cía.*, civil No. 10849, order of January 15, 1953.

The complaint was dismissed. The trial judge ruled that "although the former District Court of San Juan had acted without jurisdiction in civil case No. 18083, Pedro Fúster first and Aurelio Rodríguez later having acquired from the title holder appearing in the Registry, and without the Registry clearly revealing any vice indicative of the nullity of the title acquired, and Pedro Fúster having purchased after an examination of the title made by his attorney at that time, and without having learned from the purchasers of any extrinsic vice outside the Registry which could invalidate the title acquired, both are third parties protected by art. 34 of the Mortgage Law."

For a co-ordinate consideration of the question raised, we turn to discuss first the validity of the judicial sale whereby Hernáiz Targa & Cía. acquired the farm which it sold afterwards to Fúster. If this sale was valid, it is unnecessary to consider the sale to Fúster; on the contrary, if it is determined that it is not, we must then decide whether Fúster is a third party protected by the law.

In this case the service of notice to defendant, "The unknown Heirs of the late Facundo Mundo," was entrusted to a private person who upon returning it unserved stated: "that I received this summons on January 18, 1933, and in order to serve notice thereof on the heirs who composed the succession of the late Facundo Mundo, on the said day I went to the town of Canóvanas, the place of domicile of the deceased where his death occurred, and despite the efforts to locate them which I made in that town, *conferring not only with the decedent's presumptive relatives*, but also with friends and neighbors of the latter, I was unable to find any person having the legal status of heir of the decedent, and, from the investigation which I made, the residence of those legal heirs is unknown; that the following day, January 19, 1933, I went

to the town of Loíza to proceed with the investigation of the persons who are the unknown heirs of the late Facundo Mundo, and I was unable to serve the summons upon any person because no one there knows who are the persons who compose the succession nor their place of residence; that in the city of San Juan I have been searching constantly, since January 20, 1933 to this day, February 23, 1933, for the persons who compose the unknown succession of the deceased and I have also been unable to locate them and, consequently, to serve the summons; that in view of the fact that it is not known who are the unknown legal heirs of the late Facundo Mundo nor their place of residence, I return this summons unserved."

Under § 94 of the former Code of Civil Procedure as well as the corresponding provisions of the Rules of Civil Procedure of 1943 and 1958, it was necessary to attach an affidavit to the petition made to the court to authorize the service by edicts setting forth that after due diligence the defendant could not be found in Puerto Rico. The affidavit which plaintiff firm accompanied to its "Motion to summon by edicts defendant's unknown heirs" set forth "that according to information and belief of declarant, Facundo Mundo died intestate and his heirs or successors are unknown as well as their place of residence, wherefore notice of the complaint in this case has not been served upon the unknown heirs, as it appears on the back of the summons issued in this matter by the clerk of this court under date of January 18, 1933; that the unknown heirs of the late Facundo Mundo are a necessary party in this action and plaintiff has attached property belonging to them."

Is the recital set forth in the affidavit copied sufficient to serve summons by edicts and to dispense with the requisite of serving the same personally upon defendants? In the case of *Danis* v. *Municipal Court*, 57 P.R.R. 815 (1940), we said: "It is not sufficient, either, to state that the present

350

whereabouts of the defendants is unknown, for, as we have seen, the law requires that due diligence must be exercised in order that as a result thereof the judge may be satisfied of the existence of the facts justifying the order for publication." See, also, *Goldsmith* v. *Villari*, 27 P.R.R. 726 (1919); *Vázquez* v. *Municipal Court*, 52 D.P.R. 257 (1937). (*Miranda* v. *Heirs of Alicea*, 52 P.R.R. 247); *Planas* v. *Chambers*, 59 P.R.R. 495 (1941); *Matos* v. *District Court*, 59 P.R.R. 290 (1941); *Cerdá* v. *Ossorio*, 65 P.R.R. 315 (1945).

The affidavit in *Danis* stated: "That the defendants, upon information and belief of the affiant, in previous years had their residence in Santander, Spain, and through investigation made by the affiant in the City of San Juan, we have learned that said defendants have no relatives in this Island and their present whereabouts is unknown." We held that the statements were not sufficient to warrant summons by edicts, since "...the affiant should have stated what the investigations which he claimed to have made in order to ascertain the whereabouts of the defendants consisted of."

■ The *Danis* case merely follows the norm established in those jurisdictions having provisions similar to ours, authorizing summons by edicts whenever certain circumstances are present. Section 94 of the Code of Civil Procedure is fundamentally the same as § 412 of the Code of Civil Procedure of California. In that state it has been held that in order that summons may be served by edicts, it is necessary to show that due diligence has been exercised to locate the defendants and make personal service, and that despite diligent efforts they could not be found. *Batte* v. *Bandy*, 332 P.2d 439 (Cal. 1958); *Vorburg* v. *Vorburg*, 117 P.2d 875 (Cal. 1941); *Stern* v. *Judson*, 127 Pac. 38 (Cal. 1912); *Ligare* v. *California Southern R. Co.*, 18 Pac. 777 (Cal. 1888); *Ricketson* v. *Richardson*, 26 Cal. 149 (1864).

■■ The affidavit submitted to that effect should state specific probative facts of such diligence rather than mere

generalities other than hearsay evidence. In the cases which we have studied the steps taken are specifically stated as well as the persons investigated and their address. *Jacob* v. *Roberts, supra; Miller* v. *Superior Court,* 16 Cal. Rptr. 36 (1961) ; *Wyoming Pacific Oil Co.* v. *Preston,* 329 P.2d 489 (Cal. 1958) ; *Campbell* v. *Doherty,* 206 P.2d 1145 (N.M. 1949) ; *Union Guardian Trust Co.* v. *Cherluk,* 267 N.W. 569 (Mich. 1936) ; *Middleton* v. *Montague,* 137 N.Y.Supp. 520 (1912) ; *Rue* v. *Quinn,* 137 Cal. 651 (1907) ; *Iowa State Savings Bank* v. *Jacobson,* 66 N.W. 453 (S.D. 1896) ; *Bradford* v. *McAvoy,* 33 Pac. 1091 (Cal. 1893) ; Annotations: *Service by Publication: Affidavit,* 21 A.L.R.2d 929 (1952) ; and 47 A.L.R.2d 423 (1956). To so state them is of incalculable value to prevent fraud. It is a good practice to inquire from the community authorities, the police, the mayor, the postmaster, who are the persons who are in a better position to know the residence or whereabouts of the persons who live in the community. *Parker* v. *Ross,* 217 P.2d 373; 21 A.L.R.2d 919 (Utah 1950), concurring opinion. To show that all these steps have been taken is the only manner of establishing to the satisfaction of the judge the inability of making personal service on defendant.

The trial judge to whom a motion seeking authorization to make service by publication is submitted should ascertain that "due diligence was exercised to ascertain the whereabouts of the defendants." *Danis* v. *Municipal Court, supra.*

In *Danis* we said:

"...From the record it appears that the defendants had an attorney in fact in the city of San Juan, a circumstance which was not unknown to the plaintiff who attempted to serve the summons on the defendants through said attorney in fact, although its counsel stated that he knew that such service would have no legal effect whatever. Why did he not inquire from that attorney in fact as to the whereabouts of the defendants? Probably no one would have been in a better position than he to know the whereabouts of his principals. If the defendants

352

had no relatives in Puerto Rico, as stated in the affidavit, why did he not make inquiries through their friends or connections? This kind of facts should appear in the affidavit in order to enable the judge to determine for himself whether really due diligence was exercised to ascertain the whereabouts of the defendants, for it is not to the satisfaction of the plaintiff, but to the satisfaction of the judge who is to make the order, that the jurisdictional facts required to issue the same should be proved."

■ The affidavit accompanying the motion for authorization to summon by edicts, and the statements set forth by the private person who returned the summons unserved, do not state who were the persons from whom inquiry was made as to the residence of the members of the succession of Facundo Mundo. Plaintiff attached the farms belonging to the predecessor, but it does not appear whether the person in charge of the service visited the farms in order to ascertain whether defendants lived there, or whether the caretaker could give any information on their whereabouts. We have already said that the widow with 12 children by the second marriage of Facundo Mundo lived in one of them. It does not appear whether information was requested from the police or from the mayor of the town where the predecessor used to live. He states in the unserved summons that he went "to the town of Loíza in order to proceed with the investigation of the persons who composed the unknown heirs of the late Facundo Mundo, and was unable to serve the summons on any person because no one there knew the persons who compose the succession nor their place of residence." If he had sought that information from the mayor of Loíza, he would have learned that the mayor himself was one of the members of the defendant succession and testamentary executor of Facundo Mundo. The affidavit in this case is similar to that which we found to be insufficient in the *Danis* case. It is typical of those which merely contain generalities.

■ The affidavit being insufficient to warrant service by publication, the court never acquired jurisdiction over defendants and the judgment rendered for Hernáiz Targa & Cía. is null and void. *Cerdá* v. *Ossorio, supra; Danis* v. *Municipal Court, supra; Matos* v. *District Court, supra; Goldsmith* v. *Villari, supra.* So is also the judicial sale at which the farms were adjudicated to said firm and which it afterwards sold to Pedro Fúster.

Now then, what did the registrar state when he recorded the farms in the name of Hernáiz Targa & Cía.? Let us examine the entry of registration of the judicial sale of one of the farms:

"The mercantile partnership Hernáiz Targa y Compañía, *Sucesores, S. en C.,* filed in the District Court of this Judicial District civil case number eighteen thousand eighty [*sic*] *against the unknown heirs of Facundo Mundo* for collection of six hundred twenty-eight dollars and seventy-five cents, with interest at six per cent annually as of the eighteenth day of January nineteen hundred and thirty-three and until payment in full, and the costs incurred or which may be incurred, alleging that defendant had died in March nineteen hundred and thirty-two without having paid said sum in whole or in part; *that plaintiff did not know whether or not the debtor had died intestate, nor who were his heirs or successors, and in view of the inability to make personal service on defendant's heirs, service was made by edicts which were published in the newspaper 'La Democracia'* during forty days in the issues of February twenty-seven, March six, thirteen, twenty and twenty-seven, and April eight nineteen hundred and thirty-three, the default thereof having been entered on the following May twenty-four; and the hearing having been set, the court rendered judgment on the twenty-sixth day of the latter month ordering the defendant's unknown heirs to pay to plaintiff the said sum, legal interest and costs, which judgment was served on the debtor's unknown heirs; and the same having become final, plaintiff obtained an order of execution on the fourteenth day of last July, entered by Judge C. Llauger Díaz, for the auction sale of the attached property consisting of this farm and three others which are recorded as indicated in the marginal note. The marshal of

that court set the auction sale for the fifteenth day of August nineteen hundred and thirty-three, at two o'clock, in the afternoon, the only bidder being the plaintiff mercantile partnership, through its attorney Angel A. Vázquez, who offered one hundred fifty dollars for each farm, or a total of six hundred dollars to be credited to the debt claimed." (Italics ours.)

It can not be reasonably said that the entry copied, without more, serves as notice to an acquirer that compliance was not had with the legal provisions authorizing the court which took cognizance of the action of debt to acquire jurisdiction over defendants. It merely states that an action was brought against certain unknown heirs, and "in view of the inability to make personal service on defendant's heirs, service was made by edicts which were published in the newspaper 'La Democracia'," and the law authorizes summons by publication whenever personal service can not be made on the defendants. The defect does not appear from the Registry.

In *Lizardi* v. *Caballero*, 65 P.R.R. 77 (1945), we said that we need only consider the record in the Registry to determine whether the cause of nullity appears clearly from the registration. See, also, *People* v. *Riera*, 27 P.R.R. 1 (1919) ; *Rubio* v. *Roig*, 84 P.R.R. 331 (1962). This is the doctrine accepted by the commentators. "[T]he acquirer is not bound to resort to any other source of juridical information than the Registry which is the means of acquainting himself with the actual status of the property." SANZ FERNÁNDEZ, *Comentarios a la Nueva Ley Hipotecaria* 259 (Madrid).

We have held, however, that if the acquirer has personal knowledge of the defect which produces the nullity, he is not protected by the record of the Registry. *Alvarez* v. *Aponte*, 83 P.R.R. 595 (1961) ; *Quintana* v. *Capital of Puerto Rico*, 51 P.R.R. 103 (1937) ; *Cuebas* v. *Banco Territorial y Agrícola et al.*, 19 P.R.R. 1109 (1913) ; *Blanco* v. *Hernández et al.*, 18 P.R.R. 686 (1912) ; *Surís* v. *Quiñones et al.*, 17 P.R.R. 614

(1911); *Abella* v. *Antuñano*, 14 P.R.R. 485 (1908); *Valdés* v. *Valle y Noble*, 1 *S.T.S.P.R.* 75, 95 (1899).

ROCA SASTRE maintains that "the circumstance that the third party has acquired in *good faith,* as a necessary assumption for the protection of the registry, is a thing embodied in the important principle of *fides pública registral.*" I ROCA SASTRE, *Derecho Hipotecario* 510 (Barcelona, 1954). Thus good faith is one of the requirements to be met by the third acquirer in order to enjoy the advantages of the principle of good faith. And at p. 517 ROCA SASTRE further says:

"In what does the *mortgage good faith,* namely, the necessary good faith to enjoy the protection of the registry, consist? In general terms, we may advance this concept: *good faith,* in the technical sense employed herein, is the third acquirer's *lack of knowledge of the actual juridical status* of the right acquired in that part which is not accurately or fully shown in the Registry. It is the *ignorance* of the *inaccuracy of the Registry,* as the latter is understood in its *broad meaning.*

"Employing the legal lexicon, it may be said that good faith is the *lack of perfect knowledge* (scientia) on the part of the acquirer of the *conditions* under which the acquisition was made *which were not set forth* in the Registry."

Citing from another author, LACRUZ BERDEJO, in his *Lecciones de Derecho Inmobiliario Registral* 267 (Zaragoza, 1957), he says that "the owner 'need only be a common citizen who has *honestly* believed, when dealing with real property and real rights, that the Registry stated the truth,' the inference being that in the opinion of the author this *honesty* includes a minimum dose of diligence whenever the acquirer has founded suspicion that the Registry is inaccurate."

In discussing the good faith and the Registry, TÉLLEZ MIGUÉLEZ says at p. 130 of his *Legislación Hipotecaria* (Madrid, 1949):

"From this legal concept another more extensive concept may be inferred which defines good faith as 'lack of knowledge of the third acquirer, at the time of acquiring, of the inaccuracy

of the Registry and of the vices which may void, rescind, resolve or revoke the title of the transferrer, the determination of the existence of this requirement being—which is always presumed as long as it is not otherwise established—a question of fact to be evaluated by the courts.' "

It has also been said that "we may therefore define good faith of the third acquirer as 'the belief founded on the registration in favor of the transferrer that the latter is the real owner and that he can dispose of such right.' " VALLET DE GOYTISOLO, *La Buena Fe, la Inscripción y la Posesión en la Mecánica de la Fe Pública*, 31 *Revista de Derecho Privado* 931 (1947). See 1 MARTÍNEZ ESCOBAR, *Las Inscripciones* 26 *et seq.* (1st ed.).

■ Let us therefore analyze the facts in order to determine whether Pedro Fúster acted in good faith.

We have seen that the record of the Registry discloses that Hernáiz Targa & Cía. had filed in the District Court civil case No. 18083, for collection of money, *against the Unknown Heirs of Facundo Mundo*, that it did know who were the heirs of Facundo Mundo, and that personal service could not be made on the heirs and that it was done by edicts. This, we have seen, was false. The heirs of Facundo Mundo were known, and if the least bona fide effort had been made they could have been served personally with notice of the action brought against them by Hernáiz Targa & Cía. Did Pedro Fúster know of this falsity at the time he purchased the farms? Let us see what Fúster himself testified on this point. His attorney asked him the following questions:

"Q. The question is whether you knew where the Mundo family lived at the time of the execution proceeding.
A. I knew of one who lived in Canóvanas, and in the farm there were three or four, and in the farm which I purchased there were about ten persons.
Q. In what place did they live? In the town or in what place?
A. I knew Dr. Mundo. I knew him to be a good doctor.

Q. That's all right. But my question is, where did they live?

A. In the farm that I purchased." (Tr. Ev. 20, Matos Cintrón.)

Further on, at p. 22, the presiding judge asked him:

"Q. Now then, with whom did you talk about that?

A. With Nemesio Mundo who was the man there and I spoke to him about looking after my cattle.

Q. About what did you talk, you said?

A. Well... They told me that they had a certain debt in San Juan.

Q. Did they tell you to whom was the debt owed?

A. Well... Some said Hernáiz Targa and others Rodríguez Anté. The thing is that they expected a surprise and they were sort of confused and scared.

Q. Why were they confused and scared?

A. Well ... Because they expected the attachment at any moment and they could not look after my cattle nor any of that." (Tr. Ev. 22-23.)

Defendant Fúster further admitted that he knew the predecessor and his widow and his children who were living with the latter on the farm when he purchased it.

Thus, the evidence reveals that Fúster knew Facundo Mundo, his widow and his children; in other words, he knew that the statement appearing in the Registry that the heirs of Facundo Mundo were unknown was false. That the widow and 12 children lived on the farm at the time the complaint was filed so that Hernáiz Targa & Cía could have served notice. He also knew that the widow and her children were in possession of the farm at all times since it was awarded to Hernáiz Targa & Cía. Four years elapsed since the farms were adjudicated to it until it sold it to Fúster. Therefore, since according to the Registry personal service could not be made on the heirs of Facundo Mundo, Fúster necessarily had to infer that the entire procedure for collection of the debt as well as the adjudication of the farms in payment thereof had been made without the knowledge

of plaintiffs herein. He knew that although the Mundos knew that their father upon his death owed some money to Hernáiz Targa & Cía., the Registry disclosed that they were never notified of the complaint filed against them, nor that certain farms had been auctioned in order to satisfy the judgment. His testimony further shows that he was concerned about all of this, since he testified that he sent an attorney to the Registry before purchasing because "I wanted to know whether the auction was in order, because I wanted to know what they were telling me." This necessarily implies that he had heard the comments that something was wrong in connection with the Mundos' farms. The fact that an attorney informed him that everything was in order is immaterial, since obviously the attorney advised him in accordance with the disclosures of the Registry, but there is no evidence that Fúster had informed him that he was acquainted with all the details of the matter. It must necessarily be concluded that all these facts outside the Registry which were known to Fúster prevented him from believing that Hernáiz Targa & Cía. was the real owner of the right which was recorded in its name.

We fail to see how it may be validly maintained that Fúster honestly believed in the truth of the Registry. He knew personally that the disclosure of the record was inaccurate. In order that there be good faith, says ROCA SASTRE, it is necessary that the third acquirer have no knowledge of the true juridical status of the right acquired. And as stated by TÉLLEZ MIGUÉLEZ, "the lack of knowledge by the third acquirer at the time of acquisition of the inaccuracy and of the vices which may void, rescind, resolve or revoke the title of the transferrer." Pedro Fúster's lack of good faith is obvious. The Registry can not protect him.

Let us consider now the sale made by Fúster to Aurelio Rodríguez. The evidence establishes, without the testimony of plaintiffs' attorney to that effect having been con-

troverted and having been corroborated by an employee of the Municipality of Carolina, that when Aurelio Rodríguez was served with summons in the instant case, namely, two years after he acquired the farm, he was working as a municipal laborer for a daily wage of $2 and that when the summons was served he informed that he was not the owner of the farm and that it belonged to Fúster.[4] *Navarro* v. *Compañía Azucarera "El Ejemplo,"* 53 P.R.R. 692 (1938) ; see, however, *Biaggi* v. *Heirs of Esbrí*, 71 P.R.R. 420 (1950). There is other evidence which corroborates this. Evidently the sale made by Fúster to Aurelio Rodríguez was simulated.

In view of the foregoing, the judgment appealed from will be reversed and, consequently, the complaint of revendication will be sustained.

---

[4] The record discloses that Aurelio Rodríguez issued a note to the bearer for $3,000, secured by mortgage on this farm. The legality of this transaction has not been the object of litigation in this action.